IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CHRIS C. MALETIS III, KRISTINE K. MALETIS; THOMAS M. MALETIS; and SUSAN E. MALETIS, <br><br> Plaintiffs, <br><br> v. <br><br> PERKINS & COMPANY, P.C., an Oregon Professional corporation; JAMES B. JEDDELOH; ALAN GRIFFITH; DEUTSCHE BANK SECURITIES INC., a Delaware corporation d/b/a DEUTSCHE BANK ALEX. BROWN; DEUTSCHE BANK AG, a German corporation; and DAVID PARSE, <br><br> Defendants. | CV-05-820-ST <br><br> FINDINGS AND RECOMMENDATIONS |

STEWART, Magistrate Judge:

## INTRODUCTION

On or about May 6, 2005, four individual plaintiffs, Chris C. Maletis III, Kristine K. Maletis, Thomas M. Maletis, and Susan E. Maletis, filed a complaint in Multnomah County

1 - FINDINGS AND RECOMMENDATIONS

Circuit Court for the State of Oregon, Case No. 0505-04859, against their former accountants and tax advisors, as well as against corporate defendants, Deutsche Bank AG ("DB AG"), a German corporation, DB AG's subsidiary, Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex. Brown ("DB Alex. Brown"),[1] a Delaware corporation authorized to do business in Oregon, and an agent and employee of DB AG and DB Alex. Brown, David Parse ("Parse").[2]

In July 2000, plaintiffs sold the assets of a beer distributorship, resulting in a large capital gain. Complaint, ¶ 10. Before and after the sale, defendant Perkins & Company, P.C. ("Perkins"), and its President, defendant James B. Jeddeloh ("Jeddeloh"), were plaintiffs' accountants who provided tax advice. Perkins has and markets an alliance with BO Seidman, LLP ("BDO"), one of the world's largest accounting and tax consulting organizations.

Plaintiffs allege that they prepared their tax returns using a tax strategy recommended to them by Perkins, Jeddeloh, and an employee of Perkins, defendant Alan Griffith ("Griffith"), in order to reduce the capital gains from the sale of the beer distributorship. *Id*, ¶¶ 10-11. This strategy, in part, involved purchasing foreign currency options from DB AG.[3] *Id*, ¶¶ 12, 19, 24.[4] These purchases were apparently made through accounts opened by plaintiffs with DB Alex.

---

[1] After the transactions at issue in this case, DB Alex. Brown merged into and later changed its name to Deutsche Bank Securities, Inc.

[2] Collectively, DB AG, DB Alex. Brown, and Parse are referred to as the "Deutsche Defendants." Complaint, ¶ 7.

[3] The strategy recommended to plaintiffs appears to be the same type of strategy explained in detail in a round of motions heard in this court earlier this year. *See*, *King v. Deutsche Bank AG*, 2005 WL 611954 *1-2 (D Or March 8, 2005) (Case No. CV 04-1029-HU, Findings and Recommendation of United States Magistrate Judge Dennis J. Hubel, adopted May 9, 2005 by District Court Judge Michael W. Mosman) (explaining COBRA tax shelter scheme).

[4] As explained at oral argument, the foreign currency options are a "bet" on the price of foreign currency at a specified date and time.

Brown in August and September 2000. Deutsche Bank AG, Deutsche Bank Securities Inc., and David Parse's Notice of Removal, Exs. 2-4.

Both before and after plaintiffs' purchase of the foreign currency options, the IRS issued notices suggesting that those purchases would not reduce plaintiffs' capital gains. Complaint, ¶ 13; *King*, 2005 WL 611954 *2-3 (discussing IRS Notices 1999-59 and 2000-44). Plaintiffs allege that defendants' actions resulted in fees owed by plaintiffs exceeding $1 million; federal income tax penalties and interest exceeding $710,000; and substantial additional costs for hiring new tax and legal advisors to rectify the situation. *Id*, ¶ 30.

Plaintiffs allege a variety of state-law claims against defendants based on these allegations. Specifically, plaintiffs allege four claims against all defendants: (1) unjust enrichment regarding the FX Contracts[5] (First Claim); (2) unjust enrichment regarding the foreign currency options (Second Claim); (3) breach of fiduciary duty (Fourth Claim); and (4) fraud (Fifth Claim). Although separately stated as "claims" against all defendants, the Ninth and Tenth Claims request specific relief (Ninth Claim for declaratory judgment) or specify an alternate theory of recovery against all defendants (Tenth Claim for civil conspiracy). In addition, plaintiffs allege a claim for breach of contract and breach of fiduciary duty against the Deutsche Defendants (Third Claim), and three claims against all defendants except the Deutsche Defendants, namely: (1) two claims for professional negligence (Sixth and Eighth Claims); and (2) a claim for breach of contract and unjust enrichment (Seventh Claim).

---

[5] FX Contracts are apparently the documents which govern the purchase of the foreign currency options. *King*, 2005 WL 611954 *1 ("The options transactions were governed by an agreement called the FX contract, pursuant to which the investor entered into two opposing transactions.").

On June 6, 2005, the Deutsche Defendants filed a Notice of Removal (docket #1)[6] to this court pursuant to: (1) 9 USC § 905 because the Complaint relates to an arbitration agreement falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Agreements, 9 USC § 201-08 ("Convention"); and (2) 28 USC § 1331 because plaintiffs' right to relief necessarily depends on the resolution of a substantial federal question. Plaintiffs have now filed a Motion to Remand (docket #20), asserting that this court lacks subject matter jurisdiction over this case. For the reasons that follow, the motion should be granted, and this case should be remanded to Multnomah County Circuit Court.

Defendants have also filed a Motion to Stay Proceedings Pursuant to Section 3 of the FAA (docket #14), seeking to stay this case and refer plaintiffs' claims to arbitration. However, a ruling on that motion has been deferred pending resolution of the jurisdictional issue raised in plaintiffs' Motion to Remand.

## DISCUSSION

### I. Legal Standards Governing Motions to Remand

Defendants may remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 USC § 1441. This authority is tempered by two provisions authorizing remand to state court. The first provision, 28 USC § 1448(c), mandates remand "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." The second provision, 28 USC § 1441(c), authorizes discretionary remand of "all matters in which State law predominates."

---

[6] The Notice of Removal was filed by defendants DB AG; DB Alex. Brown, and Parse. Defendants Perkins, Jeddeloh, and Griffith filed consents to the removal. *See*, Notice of Removal, Ex 7 & Alan Griffith's Consent to Deutsche Bank AG's and Deutsche Bank Securities, Inc.'s Notice of Removal of Action to Federal Court (docket #28).

When considering a motion to remand, a federal district court must consider "whether the district court would have federal question jurisdiction originally" and be mindful of the admonition that the "removal statute is 'strictly construed against removal jurisdiction.'" *Hofler v. Aetna US Healthcare of Cal., Inc.*, 296 F3d 764, 768 (9th Cir 2002), quoting *Ethridge v. Harbor House Rest.*, 861 F2d 1389, 1393 (9th Cir 1988) (remaining citations omitted). Furthermore, "the burden of establishing federal jurisdiction falls to the party invoking the [removal] statute." *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F3d 831, 838 (9th Cir 2004) (citation omitted).

## II. **Factual Background**

Under the well-pleaded complaint rule, "[f]ederal jurisdiction typically exists only when a federal question is presented on the face of plaintiff's properly pleaded complaint." *Valles v. Ivy Hill Corp.*, 410 F3d 1071, 1075 (9th Cir 2005) (citations omitted). However, because this case was removed pursuant to the Convention, "the ground for removal . . . need not appear on the face of the complaint but may be shown in the petition for removal." 9 USC § 205. Thus, this court considers both the allegations of plaintiffs' state court complaint, and the information presented in defendants' Notice of Removal in deciding the jurisdictional issues.

The crux of this dispute is the jurisdictional effect of the implementation of a tax strategy by plaintiffs. Plaintiffs allege that both before and after their purchase of foreign currency options from DB AG, the IRS issued notices suggesting that the strategy would likely not be considered effective in reducing their capital gains. Complaint, ¶¶ 13, 20. They also allege that

they did not discover that the strategy lacked efficacy until June 2004, and thus did not file amended returns or enter the Amnesty Program.[7] *Id*, ¶¶ 13, 20, 28; Notice of Removal, ¶ 7.

In order to avoid capital gains taxes, defendants advised plaintiffs to:

> simultaneously purchase and sell Currency Options, contribute them to a partnership, and take various other steps [which then would] entitle[] plaintiffs to include the cost of the Long Option purchased in plaintiffs' basis for calculating capital and/or ordinary losses while ignoring the premiums received for the Short Options; thus offsetting gain realized in unrelated transactions.

Complaint, ¶ 29(13).

To implement that tax strategy, plaintiffs opened securities brokerage accounts by executing Account Agreements with DB Alex. Brown. The securities brokerage accounts were later used to purchase foreign currency options from DB AG which generated capital losses to offset plaintiffs' capital gains. Notice of Removal, ¶ 15.[8] The Account Agreements opening those securities brokerage accounts contain the following mandatory arbitration clause:

> I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.

Notice of Removal, Exs. 2-4, ¶ 19.

---

[7] The Amnesty Program was a "voluntary disclosure program" implemented by the IRS in late 2001 under which "taxpayers who disclosed their involvement in strategies like COBRA would avoid liability for penalties for underpayment of taxes without conceding liability for back taxes or interest." *King*, 2005 WL 611954 *4.

[8] The extent of the trading in foreign currency options is not evident in the record.

Defendants contend that this arbitration agreement falls under the Convention pursuant to 9 USC § 202. Alternatively, defendants contend that this case raises substantial disputed issues of federal tax law and therefore arises under federal law pursuant to 28 USC § 1331.

### III. Jurisdiction Under the Convention

#### A. Legal Framework

Defendants argue that the Convention allows them to remove this case to federal court:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

9 USC § 205.

Federal district courts have original jurisdiction over actions or proceedings falling under the Convention regardless of the amount in controversy. 9 USC § 203. The removing party must show both that: (i) an agreement exists that "falls under" the Convention; and (ii) the dispute "relates to" the arbitration agreement. *Beiser v. Weyler*, 284 F3d 665, 666 (5th Cir 2002). This court concludes that defendants have failed to establish that the arbitration agreement at issue "falls under" the Convention and, therefore, finds no basis for jurisdiction under the Convention.

#### B. Whether the Arbitration Agreement "Falls Under" the Convention

Arbitration agreements or arbitral awards arising out of legal relationships which are "considered as commercial" fall under the Convention. 9 USC § 202. However, an "agreement . . . arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located

abroad, envisages performance or enforcement abroad, or has some other reasonable relationship with one or more foreign states." *Id*.  In other words, the Convention permits the exercise of jurisdiction over this dispute if the arbitration agreement at issue either:  (1) arises out of a legal relationship involving at least one party who is not a citizen of the United States; or (2) meets one of three enumerated exceptions where the relationship is entirely between citizens of the United States.

The parties do not dispute that the relevant relationships are commercial in nature.  However, they part company on whether the arbitration agreement nevertheless falls under the Convention.  Defendants assert that the relevant legal relationship is between citizens of the United States (plaintiffs) and Germany (DB AG).  Alternatively, defendants argue that the relationship either "envisages performance abroad" or "has some reasonable relationship with one or more foreign states," namely Germany, where DB AG is incorporated and has its principal place of business.  However, this court concludes that the relevant legal relationship is between plaintiffs and DB Alex. Brown, all citizens of the United States for purposes of the Convention, and concludes that the nature of the relationship neither envisaged performance abroad nor has any other reasonable relationship with a foreign state.

**1. The Legal Relationship Out of Which the Arbitration Agreement Arises**

Defendants insist that DB AG, although not a signatory to the Account Agreements, is a third-party beneficiary and has enforcement rights with respect to the arbitration provision.  Defendants cite language in the Account Agreements to support that position and may well be correct that DB AG can enforce the arbitration provision.  However, the limited issue presently before this court is not whether DB AG or any other party may enforce the arbitration provision,

8 - FINDINGS AND RECOMMENDATIONS

but whether the arbitration provision and the legal relationship out of which it arises gives subject matter jurisdiction to this court under the Convention. That limited inquiry turns on whether the arbitration agreement "falls under" the Convention, which as noted earlier, depends on the citizenship of the parties to the relevant relationship and on whether the relationship envisaged performance abroad or has some other reasonable relation to a foreign state.

DB AG was not a signatory to the Account Agreements. Instead, DB Alex. Brown executed the Account Agreements with plaintiffs and later exercised the authority granted to it under those agreements to purchase foreign currency options on plaintiffs' behalf from DB AG. Because the arbitration provision at issue is in the Account Agreements, it is the legal relationship between plaintiffs and DB Alex. Brown that is relevant for purposes of 9 USC § 202.

At its heart this case involves United States citizens (plaintiffs) attempting to implement a tax strategy to avoid paying United States taxes on a sale of property (a beer distributorship) in the United States. From what can be gleaned from the record, the strategy involved setting up a partnership (Adirondak FX Partners LLC) in the United States, entering into a stock brokerage agreement with a United States citizen, DB Alex. Brown,[9] and making "bets" on the price of foreign currencies in the form of purchases of foreign currency options. Those purchases were apparently then contributed to the partnership, in an effort to offset the capital gains from the sale of the beer distributorship.

///

---

[9] For purposes of the Convention, corporations are deemed to be "citizens" of the United States if they are incorporated in, or have their principal place of business in, the United States. 9 USC § 202. DB Alex. Brown is a Delaware corporation and appears to have a place of business in Baltimore, Maryland, although it is unclear where its principal place of business might be located. Complaint, ¶ 6; Notice of Removal, Exs. 2-4.

At least one of the foreign currency options transactions appears to have been carried out between DB Alex. Brown and DB AG. However, that transaction was between DB AG's New York branch (in New York) and DB Alex. Brown (in Chicago), and was carried out via a facsimile communication all within the United States. Dubanevich Dec, Ex 2. And, as explained in detail at oral argument by plaintiffs' counsel, the transaction involved no investment in the stock of a foreign corporation, but instead involved a "bet" on the price of a foreign currency on a specific date at a specified time.

This court concludes that the relevant legal relationship at issue in this case is between two citizens of the United States. As a result, jurisdiction under the Convention is lacking unless one of the exceptions in 9 USC § 202 applies.

### 2. Exceptions

Because DB AG is not a party to the Account Agreements containing the arbitration clause, this case falls under the Convention only if the legal relationship between plaintiffs and DB Alex. Brown either: (1) involves property located abroad; (2) envisages performance or enforcement abroad; or (3) has some other reasonable relation with one or more foreign states. 9 USC § 202.

DB AG does not argue that the legal relationship involved property located abroad or envisaged enforcement abroad. The record reveals no foreign property that was the subject of any relevant transaction. Furthermore, the Account Agreements specify that arbitration would take place with either the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., and that the agreements would be deemed to have been made in the State of New York and would be construed in accordance with New York law. Notice of

Removal, Exs. 2-4, ¶¶ 19-20. Thus, resort to these two jurisdictional lifelines appears foreclosed.

Instead, DB AG argues that the relationship between DB Alex. Brown envisaged performance abroad and otherwise related to a foreign state, namely Germany, where DB AG is incorporated. This court does not agree that the Convention sweeps so broadly.

The Account Agreements between plaintiffs and DB Alex. Brown authorize DB Alex. Brown to engage in certain purchase and sales transactions with affiliates of DB AG:

> I authorize [DB] Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of [DB] AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to [DB] Alex. Brown's relationship with me.

Notice of Removal, Exs. 2-4, ¶ 16.

Although this provision authorizes DB Alex. Brown to purchase and sell foreign securities to affiliates of DB AG, all indications are that the Account Agreements were executed with a view toward a specific type of transaction, namely the purchase of foreign currency options which simply involve the purchase of "bets" on foreign currency. Nothing in the record indicates that the parties anticipated or completed the purchase or sale of stocks in foreign companies, or anticipated or completed any other activity in a foreign country. While there was apparently a purchase from DB AG's New York branch, the mere authority to carry out a transaction of that nature is insufficient, in and of itself, to meet the requirement under the Convention that the relationship be one which envisages foreign performance or otherwise has a "reasonable relationship" with Germany.

11 - FINDINGS AND RECOMMENDATIONS

Defendants cite several cases in support of their jurisdictional argument under the Convention. However, each of those cases is distinguishable. Two of the cases involved foreign property. *Chew v. KPMG, LLP.*, Civil No. 3:04CV748BN, p. 10 (S D Miss, Jackson Division, Jan 6, 2005) (direct investment in the stock of DB AG); *Reddam v. KPMG, LLP.*, Case No. SA CV 04-1227-GLT (MANx), p. 4 (CD Cal, Southern Division, Dec 14, 2004) (same). Unlike *Chew* and *Reddam*, this case does not involve direct investment in foreign stock, but merely involved "bets" on the price of a given foreign currency as of a specified date and time. The evidence in the record indicates that those were simply paper transactions carried out by DB Alex. Brown and DB AG's New York branch. Nothing in the record indicates that plaintiffs ever made an investment, direct or otherwise in the stock of a foreign corporation.

In another case cited by defendants, the party moving for remand "did not contest that the arbitration agreements 'fall[] under the Convention,'" and instead was limited to the issue of whether the subject matter of the case "relate[d] to" an arbitration agreement falling under the Convention, as required under 9 USC 205. *Beiser*, 284 F3d at 667-68. *Beiser* is likewise distinguishable. Because the plaintiff did not contest that the arbitration agreements fall under the Convention, discussion of that issue is noticeably absent. Instead, the court focused all of its attention on the issue of whether the subject matter of the state court litigation related to an arbitration agreement or award falling under the Convention.

In the other cases relied on by defendants, the court found jurisdiction appropriate because the commercial relationship envisaged performance abroad. *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F3d 327, 340-41 (5th Cir 2004) (agreement involved performance of pipefitting services on barges in West Africa); *Lander Co. v. MMP Investments, Inc.*, 107 F3d

12 - FINDINGS AND RECOMMENDATIONS

476, 481 (7th Cir 1997) (contract for the distribution by MMP in Poland of products manufactured by Lander in the United States). Unlike *Freudensprung* and *Lander*, the arbitration agreement at issue here, while permitting DB Alex. Brown to purchase and sell foreign currency options from DB AG, does not arise from a relationship which expressly envisioned direct investment in a foreign corporation, or travel into a foreign country to provide services or distribute products.

### IV. Jurisdiction Based on a Substantial Federal Question

As an alternative to jurisdiction under the Convention, DB AG argues that this court has jurisdiction under 28 USC § 1331 based on a substantial federal question.

#### A. Legal Framework

Under 28 USC § 1331, federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The "vast majority of cases that come within this grant of jurisdiction . . . are those in which federal law creates the cause of action." *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 US 804, 808 (1986) (internal punctuation and citation omitted). However, federal jurisdiction may also be appropriate where "it appears that some substantial disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for S. Cal.*, 463 US 1, 13 (1983).

The doctrine that "federal question jurisdiction will lie over state-law claims that implicate significant federal issues . . . captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of

13 - FINDINGS AND RECOMMENDATIONS

uniformity that a federal forum offers on federal issues." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 125 S Ct 2363, 2367 (2005) (citations omitted). While "no specific recipe exists for a court to alchemize a state claim into a federal claim," *Lippitt v. Raymond James Fin. Svcs., Inc.*, 340 F3d 1033, 1042 (9th Cir 2003), "federal jurisdiction demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable,* 125 S Ct at 2367 (citations omitted). Thus, "a court must look at a complex group of factors in any particular case to decide whether a state claim actually 'arises' under federal law." *Lippitt,* 340 F3d at 1042-43.

Even where a claim involves a sufficiently substantial and disputed question of federal law, "the exercise of federal jurisdiction is subject to a possible veto [in that] the federal issue will ultimately qualify for a federal forum only if federal jurisdiction is consistent with federal judgment about the sound division of labor between state and federal courts governing the application of [28 USC] § 1331." *Grable*, 125 S Ct at 2367.

### B. Application

Defendants argue that this case involves a substantial and disputed question of federal over the legality or efficacy of a certain tax strategy or shelter in which plaintiffs were advised to simultaneously purchase and sell foreign currency options, contribute them to a partnership, and take certain other steps to offset a capital gains tax in the 2000 tax year. According to defendants, plaintiffs cannot prevail on any of their asserted claims without proving that the positions asserted by the IRS in certain notices are legally correct. This court disagrees and finds no substantial and disputed question of federal law sufficient to give rise to federal question jurisdiction.

A central theme of plaintiffs' allegations is that defendants gave them shoddy tax and legal advice, resulting in substantial losses to them in the form of fees, tax penalties, and additional costs in hiring new tax and legal advisors to rectify the misstep. However, plaintiffs do not contest any federal tax regulation or law. Instead, plaintiffs have apparently settled their account with the IRS for any claims involving the tax shelter recommended by defendants and now seek to recoup the losses allegedly generated by defendants' alleged professional negligence or misrepresentations. A review of plaintiffs' allegations reveals that their claims primarily involve a factual determination about whether defendants blundered by recommending a certain tax strategy to plaintiffs, or deliberately misled plaintiffs into undertaking that strategy. At least two IRS Notices will buttress plaintiffs' arguments, namely IRS Notice 1999-59 and Notice 2000-44, which plaintiffs assert effectively were a "red flag" concerning the tax strategy recommended by defendants.

Defendants contend that the IRS Notices are nothing more than the announcement of a litigating position by setting forth the IRS's views on the issues addressed and do not have the force and effect of law. Further, defendants assert that the crucial question will be whether the IRS has correctly interpreted the operative provisions of the federal tax code.

In *Grable*, the Supreme Court found federal jurisdiction appropriate over a quiet title action where the meaning of a federal tax statute was actually in dispute and where the sole issue was whether plaintiff was given notice under that statute. "Whether Grable was given notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case." *Grable*, 125 S Ct at 2368. The Court emphasized the direct interest

15 - FINDINGS AND RECOMMENDATIONS

of the federal government in the action and in the negligible effect the division of federal and state judicial responsibilities:

> The meaning of the federal tax provision is an important issue of federal law that sensibly belongs in a federal court. The government has a strong interest in the prompt and certain collection of delinquent taxes and the ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice to allow buyers . . . to satisfy themselves that the Service has touched the bases necessary for good title. The Government thus has a direct interest in the availability of a federal forum to vindicate its own administrative action, and buyers (as well as tax delinquents) may find it valuable to come before judges used to federal tax matters. Finally, because it will be the rare state title case that raises a contested matter of federal law, federal jurisdiction to resolve genuine disagreement over federal tax title provisions will portend only a microscopic effect on the federal-state division of labor.

*Id* (internal punctuation and citations omitted).

In contrast to *Grable*, plaintiffs and the IRS have settled their tax dispute. Although the IRS may have similar pending disputes with other taxpayers, it is not a party to this case and has no direct interest in the outcome. Furthermore, opening the doors of federal courthouses to cases alleging these types of state law claims for giving faulty or fraudulent advice premised upon a misapplication of federal tax laws would inundate the federal courts with otherwise garden variety state tort claims. *Grable* underscores that *Merrell Dow*, which alleged that a drug company had violated a federal misbranding standard, retained a "contextual enquiry" leading to "sensitive judgments about congressional intent, judicial power, and the federal system." *Grable*, 125 S Ct at 2370. The absence of any federal cause of action merits consideration in two ways:

> The Court saw the fact as worth some consideration in the assessment of substantiality. But its primary importance emerged when the Court treated the combination of no federal cause of action and no preemption of state remedies for misbranding as an important clue to Congress's conception of the scope of jurisdiction to be exercised under § 1331. The court saw the missing cause of action not as a missing federal door key, always required, but as a missing welcome mat, required under the circumstances, when exercising federal jurisdiction over a state misbranding action would have attracted a horde of original filings and removal cases raising other state law claims with embedded federal issues. For if the federal labeling standard without a federal cause of action could get a state claim into federal court, so could any other federal standard without a federal cause of action. And that would have meant a tremendous number of cases.

*Id.*

As in *Merrell Dow*, this case may be characterized as encompassing state law claims with embedded federal issues. While there will no doubt be a bitter contest over the legal effect of the IRS Notices, that issue is but one of many in otherwise garden variety state tort claims. The fact that the nature of the advice allegedly given to plaintiffs involved judgments about the interpretation of federal tax law does not automatically convert those state law claims into ones involving substantial and contested federal issues.

## **CONCLUSION**

In sum, this court finds no basis for federal jurisdiction under either the Convention or based on a substantial disputed question of federal law. Therefore, this court further finds that this case should be remanded in its entirely to Multnomah County Circuit Court. Accordingly, this court need not and does not address the arguments raised by the parties about whether supplemental jurisdiction should be exercised over claims against defendants other than the Deutsche Defendants.

17 - FINDINGS AND RECOMMENDATIONS

## RECOMMENDATIONS

For the reasons set forth above, plaintiffs' Motion to Remand (docket #20) should be GRANTED and this case remanded to Multnomah County Circuit Court (Case No. 0505-04859).

In addition, defendants' Motion for a Stay of Proceedings Pursuant to the FAA (docket #14) should be STRICKEN AS MOOT.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **September 30, 2005.** If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 13th day of September, 2005.

                                                    _/s/ Janice M. Stewart _____
                                                    Janice M. Stewart
                                                    United States Magistrate Judge